Ira GERSHWIN, Arthur Gershwin, Emanual Alexandre and Hugo Pollock, as Executors and Trustees under the Last Will and Testament of Rose Gershwin,

v.

The UNITED STATES.

No. 174–55.

United States Court of Claims.
July 12, 1957.

478

See also, 150 F.Supp. 799.

Martin A. Roeder, New York City, for plaintiffs. Leonard S. Saxe, New York City, was on the briefs.

Harold S. Larsen, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Andrew D. Sharpe, James P. Garland, and Gilbert E. Andrews, Jr., Washington, D. C., were on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiffs are the executors of the estate of Rose Gershwin, deceased. Rose Gershwin inherited from her son, George, certain unpublished musical compositions. She transferred limited motion picture rights to them to Twentieth Century-Fox Film Corporation. Defendant treated the proceeds of the sale as ordinary income, on the theory that the transaction was a license to use the compositions, and not a sale of certain motion picture rights to them, as plaintiffs' claim, and assessed the income tax accordingly. This is the issue to be settled.

The difference between a sale and a lease or license is that, in the case of a sale, the owner parts with ownership of the thing or of some property right in it, and conveys this property right to another; whereas, in the case of a lease or license, the owner retains ownership of the property, but permits another to use it for a limited time or purpose. The test is whether the owner retains ownership of the property right concerned.

The instrument, dated July 23, 1945, evidencing the transaction here involved has all the earmarks of a sale. (Under it, decedent transferred her interest in the musical composition inherited from her son, George; and Ira Gershwin, who had written the lyrics, transferred his interest.) It recites in article 6:

"The Vendor and the Lyricist hereby agree to and do hereby grant, sell, transfer and assign to the Producer, its successors and assigns, forever, free and clear of any and all claims for royalty or other compensation [,] the sole and exclusive world-wide motion picture rights and motion picture synchronization in and to the music and lyrics and every part thereof, provided, however, that the Vendor and Lyricist reserve unto themselves

such so-called 'small performing rights' as are customarily granted by member composers and authors to the American Society of Composers, Authors and Publishers. * *"

The instrument further recited:

" * * * It is further expressly understood and agreed that the rights in and to the said music and lyrics herein sold to the Producer shall be its sole and exclusive property and that the Producer, its lessees, licensees, and assigns shall have the free and unrestricted right to the exercise and use of such rights in and to said music and lyrics and that the Producer shall not be obligated to account to the Vendor and/or the Lyricist or any other person, firm or corporation for any royalties, rentals or other sums of money received by the Producer for or on account of the use or exercise by it or its lessees, licensees, or assigns of any such rights. The Vendor and Lyricist expressly agree that they will not, without the written consent of the Producer, permit a 'dramatic' or a 'grand' use of any song or any of the music and/or lyrics hereinafter set forth in Exhibit 'A', or permit the use of any part or all of said music and lyrics as a production number; it being understood that the Producer is granted and shall own and control all 'grand performing rights' including 'grand radio performing rights.'

In clause 11 of the contract the Producer, who was the transferee, was given the right to assign or otherwise dispose of the rights granted.

For the rights granted the grantee, called the Producer, agreed to pay $80,-000 in cash and $70,000 on February 1 following.

The foregoing evidences an absolute conveyance of an interest in the musical compositions. However, the grant was subject to the reservation of a right in the owner to use any two of the musical compositions in a motion picture biography of George and Ira Gershwin, as appears in a paragraph not quoted, and it was subject also to the following reservation:

"Notwithstanding the provision of this Article, it is agreed that all rights of every nature in and to any part of said music and lyrics as hereinafter set forth in Exhibit 'A' hereof which is not used in the production, distribution, exhibition, exploitation and advertising of the photoplay in which said music and lyrics shall first be utilized, as finally released, in the United States, shall revert to the Vendor and Lyricist, respectively, but that no part of the consideration payable to the Vendor and Lyricist hereunder shall be repaid to the Producer for or by reason of any such reversion to the Vendor and the Lyricist."

The result is that, in consideration of $80,000 cash and $70,000 on February 1 following, the owner transferred to the Producer her entire right in such listed musical compositions as the Producer might choose to use, subject to her right to use two of them for the purpose stated, and all of them for a limited purpose. The title to any the Producer did not choose to use reverted to the owner, but as to the compositions used by the Producer, the owner was divested of title, except to a limited extent, and the Producer was vested with title. After the transfer the owner could no longer exercise any right of ownership over them, except for the limited purpose stated. However, if the Producer, or its assigns, chose to use them again in connection with any other motion picture, it was obligated to pay the owner additional compensation, as set out in article 14, which reads in part:

"It is mutually understood and agreed that, in the event the Producer shall hereafter utilize any of the music and lyrics in connection with the remake of its motion picture production now tentatively entitled 'The Shocking Miss Pilgrim',

or in any motion picture production other than the Producer's motion picture production tentatively entitled 'The Shocking Miss Pilgrim', the Producer will pay to the Vendor and Lyricist, jointly, in connection with each such remake and each such other motion picture production, the total sum of Seventy-five Thousand Dollars ($75,000.00). * * * "

Notwithstanding the necessity for the payment of additional compensation, after the transfer no one other than the Producer or its assignees had the right to use the compositions, except in the minor cases in which the owner reserved the right to use them. If some third person desired to use the songs in connection with a motion picture, it could obtain the right to do so only from the Producer. It could not be obtained from the grantor; she had disposed of this right.

The case is similar to Herwig v. United States, 105 F.Supp. 384, 122 Ct. Cl. 493. In that case the entire motion picture rights in one book was concerned; whereas, in this, the conveyance was limited to such compositions as the Producer might choose to use, but as to them it was a complete transfer of title, subject only to the right to receive additional compensation for a further use, and subject to a limited right of use in the grantor.

But in both cases the transfer was absolute, for a fixed sum, not dependent on the revenue realized by the transferee's use of them. It divested the grantor of a portion of her rights in the compositions and vested them in another.

What reverted to the grantor, after the Producer had used some of the songs, was what was left after the grantee had selected the compositions it wished to use. The right to use those selected and used by it never reverted to the grantor, nor could it ever revert to her. If the grantor wanted to use them for another motion picture or to permit another to use them, she would have had to get the Producer's permission to do so.

The reservation of certain rights in the grantor is not inconsistent with a sale of a property right to the Producer. Wing Engineering Corp., et. al. v. United States, Ct.Cl., 151 F.Supp. 314; Commissioner v. Celanese Corp., 78 U.S.App.D. C. 292, 140 F.2d 339.

The receipts under the transaction in Cory v. Commissioner, 2 Cir., 230 F.2d 941 were held to be taxable as ordinary income only because the consideration was indeterminate, depending on sales by the transferee. It is implicit in that opinion, however, that the transaction would have been held a sale had the consideration been for a definite sum, not contingent on the revenue derived from use. In that case also the vendor sold only a portion of his rights under his copyright, as in this case.

■ We hold that the transaction in this case was a sale of a portion of decedent's rights in the musical composition.

Defendant's position that decedent was in the business of buying and 'selling musical compositions is plainly without merit. She inherited the musical compositions from her son, and never acquired or sold any others. Her only dealings in musical compositions were with respect to those she had inherited, and these were less than a half dozen in number. She was not engaged in any business.

Plaintiffs are entitled to recover. Their motion for summary judgment is granted. The amount of recovery will be determined under Rule 38(c), 28 U.S.C. A.

Defendant's motion for judgment on the pleadings is denied.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.